# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF TENNESSEE
# AT GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | NO. 2:08-CR-102 |
| | ) | |
| FRANCISCO URBINA | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on objections to the Presentence Investigation Report ("PSR") filed by the defendant, Francisco Urbina. An evidentiary hearing was conducted on April 5, 2010, where the testimony of DEA Agent Michael Templeton, the defendant and co-defendant, Ramon Cervantes-Gomez was heard. After due consideration, the defendants' objections will be OVERRULED.

The defendant is one of several defendants arrested on September 23, 2008, and subsequently convicted of conspiracy to manufacture 1,000 or more plants of marijuana. The defendant and co-defendants, Cervantes-Gomez and Jaimes Esquivel-Lausin, cultivated and maintained a marijuana grow operation in the Pisgah National Forest in western North Carolina. In March, 2008, Urbina, Cervantes-Gomez and Esquivel-Lausin were transported from Johnson City, Tennessee, to the grow location off the Blue Ridge Parkway by a co-conspirator.[1] They were provided a Bersa .45 caliber

---

[1] So far as the Court can tell, the identity of this co-conspirator has never been clearly established. Likewise, the defendants have given conflicting information about who was in charge of the grow operation. Cervantes-Gomez originally told agents Jesus Huerta was involved but later maintained, as did Urbina, that "Jose Chavo" hired them to cultivate the marijuana crop. Huerta was ultimately convicted by a jury.

handgun "as protection against bears."[2]

Urbina, Cervantes-Gomez and Esquivel-Lausin lived in a tent at the marijuana grow site from March 2008, until September, 2008. In late September, 2008, an off-duty Forest Service employee who was searching for ginseng in the national forest stumbled upon the marijuana grow operation. Agents of the Forest Service subsequently set up video surveillance at the marijuana site and the defendant was recorded cultivating the marijuana plants. On September 23, 2008, agents with the Forest Service and other law enforcement agents conducted surveillance on the roadway which provided access to the marijuana patch. Later in the afternoon, Urbina, Cervantes-Gomez and Esquivel-Lausin were observed carrying duffle bags up the path from the marijuana patch to the roadway.

Several minutes later, the three were picked up in a van driven by co-defendant Wiley Barnett. Agents stopped the van and located 193 pounds of marijuana in the duffle bags. Inside one of the duffle bags was the .45 caliber handgun. Agents also found several cell phones in the van and found the numbers of several co-defendants, including that of Jesus Huerta, on Urbina's phone. Barnett confessed to the agents that he had picked up the defendants and marijuana for delivery to Huerta. On September 24, agents counted a total of 3,717 marijuana plants at the marijuana patch.

Agent Templeton testified at the evidentiary hearing that firearms are part and parcel of the drug trade. He further testified that the handgun, which had a considerable amount of rust, was recovered from one of the duffle bags with marijuana in the back of the van in which the defendant was arrested, in close proximity to all three defendants. Urbina, in an effort to cooperate, was later

---

[2] This was stipulated to by the government and the defendants as part of the factual bases for defendants' pleas of guilty and is quoted from the Plea Agreements.

2

interviewed by Templeton. Templeton terminated the interview with Urbina after about ten minutes because Urbina was not being truthful.

Urbina testified that the handgun was found lying on the ground at the marijuana grow site about one week after he and the others arrived at the marijuana patch. According to Urbina, he never touched the handgun and did not know it was placed in one of the duffle bags on September 23. He acknowledged that he knew Jesus Huerta, who was known to him as "Chuy," but that he did not work for Huerta. He did, however, admit to calling Huerta on his cell phone just before his (Urbina's) arrest. Urbina testified that he was hired by Jose Chavo to work at the marijuana patch.[3]

In the PSR, the probation officer recommends a two level enhancement in Urbina's base offense level of 26 pursuant to USSG § 2D1.1(b)(1) for possession of a dangerous weapon (the Bersa .45 caliber handgun). The guidelines provide that a two-level enhancement is warranted "if a dangerous weapon (including a firearm) was possessed" during the commission of the crime. Furthermore, the probation officer did not recommend a safety valve reduction, under USSG § 5C1.2(a) and 18 U.S.C. § 3553(f), nor a minor role adjustment under USSG § 3B1.2. The defendant objects to both the enhancement under USSG § 2D1.1(b)(1) and claims eligibility for the safety valve reduction, as well as a minor role adjustment. The government opposes defendant's position.

### Section 2D1.1(b)(1)/Firearm Enhancement

Once the government demonstrates by a preponderance of the evidence that a defendant

---

[3] Urbina denied that he knew the true nature of the work he was hired for until he arrived at the marijuana grow site, taken there by a thin Caucasian male who spoke English. Urbina, who speaks Spanish, but no English, further testified that he did not know how to cultivate marijuana, but learned how to do so from the Caucasian male who took him and his co-defendants to the marijuana patch. The Caucasian male stayed at the patch for about three hours, according to Urbina.

actually or constructively possessed a firearm during the commission of the drug offense, the government has satisfied its burden under § 2D1.1(b)(1). *United States v. Moses*, 289 F.3d 847, 850 (6th Cir. 2002); *United States v. Snyder*, 913 F.2d 300, 304 (6th Cir. 1990). As noted above, possession may be actual or constructive. *United States v. Cochran*, 14 F.3d 1128, 1132 (6th Cir. 1994). "Constructive possession of an item is the ownership, or dominion or control over the item itself, or dominion over the premises where the item is located." *United States v. Darwich*, 337 F.3d 645, 665 (6th Cir. 2003).

Once the government has met its burden, "a presumption arises that such possession was connected to the offense." *United States v. Sanchez*, 928 F.2d 1450, 1460 (6th Cir. 1991) (citing *United States v. Moreno*, 899 F.2d 465, 470 (6th Cir. 1990)). The government need not produce any further evidence to establish a connection between the firearm and the charged conduct to support a § 2D1.1(b)(1) enhancement. The burden is on the defendant to establish that "it is clearly improbable that the weapon was connected to the offense." USSG § 2D1.1(b)(1), App. Note 3. If the defendant fails to make such a showing, then the enhancement is appropriate. *U.S. v. Solorio*, 337 F.3d 580, 599-600 (6th Cir. 2003). In the Sixth Circuit, overcoming the presumption of connection is difficult and a defendant will be found to have overcome it only if he shows that the nature of the weapon found or the circumstances in which it was found makes it extremely unlikely that the firearm had anything to do with the drug offense. *See United States v. Chalkian*, 971 F.2d 1206, 1216 (6th Cir. 1992); *United States v. Garner*, 940 F.2d 172, 176 (6th Cir. 1991).

At the evidentiary hearing on April 15, this Court ruled orally that the government had satisfied its burden of proving that defendant possessed the .45 caliber handgun. Defendant asserts, in his post-hearing memorandum, [Doc. 1034], however, that he never knowingly possessed the

firearm. He cites a lack of experience with firearms,[4] his lack of criminal history, his lack of knowledge of how the firearm got to the camp where the marijuana was grown and cultivated,[5] the condition of the firearm,[6] and his lack of leadership role in the offense, in support of his argument. Even if the government carried its burden of proof, Urbina argues, the very same facts establish that he has overcome the presumption and established that "it was clearly improbable that the weapon was connected to the offense."

There is no proof that the defendant actually possessed the handgun. There is considerable evidence, however, that the defendant constructively possessed the firearm. Constructive possession, Urbina correctly notes, "exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." Memo. of Def. at p. 3 (citing *United States v. Kincaide*, 145 F.3d 771, 782 (6th Cir. 1998). Constructive possession, as defendant acknowledges, may be proven by circumstantial evidence. And, although presence where a firearm is found is insufficient, without more, to establish the requisite knowledge, power or intention to exercise control over the firearm, *United States v. Birmley*, 529 F.2d 103, 107-08 (6th Cir. 1976), dominion over the premises where the firearm is located is sufficient to establish constructive possession. *Kincaide*, 145 F.3d at 782. Where a defendant is in non-exclusive possession of premises where a firearm is located, it cannot be inferred that he knew the firearm was present and had control of it

---

[4] The defendant testified that the only gun he had ever had any experience with was a BB gun, before he came to the United States.

[5] As noted above, Urbina claims that the firearm was discovered sometime after he and his co-defendants arrived at the marijuana grow site.

[6] The defendant testified, and Agent Templeton confirmed, that the firearm was rusty. Urbina testified that he was afraid to pick it up.

5

unless there are other incriminating statements or circumstances to buttress such an inference. *See United States v. Bailey*, 553 F.3d 940, 945 n.3 (6th Cir. 2009).

Defendant's arguments are problematic for several reasons. As an initial matter, the defendant knew the firearm was present at the camp and that he had the right to control the firearm. Although the defendant testified that he was unaware that the firearm was at the grow site until about a week after he, Cervantes-Gomez and Esquivel-Lausin arrived at the site, [7] he stipulated, at the time of the entry of his guilty plea, that, in March, 2008, the three defendants were transported to the grow location and "*[t]hey* were provided with a Bersa .45 caliber handgun as protection against bears." (emphasis added). Thus, by his own admission, Urbina possessed the firearm and had the right to exercise control over it, regardless of its purpose. As noted above, the government is only required to prove that Urbina possessed the firearm, and not a connection between the firearm and the charged conduct, which is presumed. Once possession is proven, the presumption attaches.

Secondly, Urbina, Cervantes-Gomez and Esquivel-Lausin lived at the marijuana grow site for approximately six months. During that time they had joint dominion and control over the premises. Urbina knew the firearm was located on the premises for almost the entire time and one of the three packed the firearm[8] in one of the duffle bags when they left the site. It appears quite clear that Urbina had dominion over the marijuana grow location and knew that the handgun was located on the premises. Furthermore, he had the power to exercise control over the firearm and it

---

[7] In view of the stipulation, the Court does not find Urbina's testimony to be credible. Even absent the stipulation, Urbina's testimony as a whole lacked credibility and, in fact, was largely incredible.

[8] Both Urbina and Cervantes-Gomez testified at the evidentiary hearing that they did not know who put the firearm in the bag when they left the marijuana grow site. Esquivel-Lausin testified likewise at his sentencing hearing.

is irrelevant that he might not have actually done so. It is also clear that, at least at some point, he intended to exercise control over the handgun, at least "as protection against bears." Finally, as noted, defendant correctly argues that his mere presence in proximity to the firearm is not enough to establish the requisite knowledge, power or intention to exercise control over the firearm. But this is not a "mere proximity" case. There is more here. *See United States v. Shull*, 349 Fed. Appx. 18 (6th Cir. 2009) (citing *United States v. Richardson*, 161 F.3d 728, 732 (D.C. Cir. 1998) (holding that mere proximity to contraband is not enough to constitute constructive possession, but "proximity coupled with 'evidence of some other factor . . .'" is enough) (quoting *United States v. Morris*, 977 F.2d 617, 620 (D.C. Cir. 1992). The factor which distinguishes this case from the "mere proximity" cases is that Urbina knew the firearm was in the camp at the grow location. As the Sixth Circuit recently said in *United States v. Morrison*, 594 F.3d 543 (6th Cir. 2010):

> The critical difference between this case and, say, *United States v. Bailey*, 553 F.3d 940 (6th Cir. 2009), is that here the government presented evidence that *Morrison knew* the gun was within his immediate control. Indeed what the mere-proximity cases seem concerned about, above all, is the conviction of a defendant who did not even know the gun was there. In *Bailey*, for example, the court recounted a long hypothetical about the teenage driver who, through no fault of his own, is completely unaware that a gun lies beneath his seat; and the court said the record before it made *Bailey* no different from that hypothetical. *Id.* at 948-49.

*Id.* at 545.

Nor does Urbina's argument that he has overcome the presumption that his possession of the handgun was connected to the marijuana conspiracy offense have merit. First of all, his argument that the government stipulated that the handgun was provided "as protection from bears" is unconvincing. Even if the handgun was provided for that purpose, that does not foreclose the possibility that the handgun was also provided and available for the dual purpose of protecting both

the marijuana crop and the marijuana conspirators from the usual threats associated with drug trafficking. That the handgun was provided by a drug trafficker to other drug traffickers who were engaged in growing and cultivating a large marijuana crop leads to the reasonable inference that there is a connection between the handgun and the marijuana grow operation. The possession of firearms, such as the .45 caliber handgun, is, as the government points out, part and parcel of the drug trafficking trade. That is especially the case where, as here, the handgun was carried from the grow site with the duffle bags of marijuana and placed in the rear of the van driven by Wiley Barnett on September 23 – the very same duffle bags upon which Urbina, Cervantes-Gomez and Esquivel-Lausin were seated when arrested.

### Section 5C1.2(a) and 18 U.S.C. § 3553(f)/Safety Valve

The defendant claims that the probation officer was in error when she declined to adjust his sentence on the basis of the "safety valve" provision of USSG § 5C1.2. Defendants who meet all criteria for the safety valve adjustment are entitled to a two level downward adjustment in the offense level and can receive a sentence beneath the mandatory minimum sentence otherwise prescribed. 18 U.S.C. § 3553(f); USSG § 5C1.2; USSG § 2D1.1(b)(11).

To qualify for the safety valve adjustment, a defendant must satisfy five qualifying criteria: He had no more than one criminal history point, he did not use violence or threaten violence in committing his offense or possess a firearm or other dangerous weapon in connection with the offense, the offense did not result in death or serious bodily injury to any person, the defendant was not an organizer, leader, manger or supervisor in the offense and, not later than the time of sentencing, the defendant must truthfully provide to the government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct

8

or a common scheme or plan. 18 U.S.C. § 3553(f); USSG § 5C1.2(a)(1)-(5). The defendant has the burden of proving that he qualifies for the safety valve adjustment. *United States v. Adu*, 82 F.3d 119, 123-24 (6th Cir. 1996).

Urbina's claim for the safety valve adjustment fails with respect to two of the necessary qualifying criteria. First of all, the defendant is precluded from the safety valve adjustment because of his possession of a firearm in connection with the offense. Although there has been some confusion in the Sixth Circuit about whether application of the enhancement of USSG § 2D1.1(b)(1) necessarily precludes application of the safety valve, that confusion has now been resolved. In *United States v. Stewart*, 306 F.3d 295 (6th Cir. 2002), the Sixth Circuit held that where actual or constructive possession of a firearm warrants an increase to defendant's base offense level under § 2D1.1, such possession defeats application of the safety valve. *See also United State v. Johnson*, 344 F3d 562 (6th Cir. 2003) (holding that the imposition of a two-level enhancement under § 2D1.1(b)(1) precludes application of the safety valve). In *United States v. Bolka*, 355 F3d 909 (6th Cir. 2004), a panel of the Sixth Circuit held that a sentence enhancement under § 2D1.1(b)(1) does "not necessarily preclude the application of a 'safety valve' . . . reduction" under § 5C1.2(a). The Sixth Circuit has now further clarified, however, that the holding in *Bolka* is not controlling and that the rule in the Sixth Circuit remains that an enhancement under § 2D1.1(b)(1) precludes safety valve eligibility. *United States v. Patterson*, 145 Fed. Appx. 988 (6th Cir. 2005). In *Patterson*, the Sixth Circuit concluded that

> [t]he *Bolka* court's conclusion is not supported by the sentencing guidelines or the language in *Johnson*. [*U.S. v. Johnson*, 344 F.3d 562 (6th Cir. 2003) (holding that the firearm enhancement precludes the application of the safety valve)]. When, as here, a defendant cannot rebut the presumption that he possessed a firearm during the commission of an offense by showing that it was clearly improbable

9

>   that the weapon was connected to the offense, then that defendant is
>   ineligible for 'safety valve' status.

*Patterson*, 145 Fed. Appx. at 993. Thus, because Urbina cannot overcome the presumption that he possessed a firearm during the commission of the offense by showing that it was clearly improbable that the weapon was connected to the offense, he is ineligible for safety valve status.

Secondly, Urbina cannot establish that he qualifies under the fifth criterion for the safety valve adjustment, which requires that he truthfully provide to the government all information and evidence he has concerning the offense. The Sixth Circuit has held that § 5C1.2(5) "clearly requires[s] an affirmative act by the defendant truthfully disclosing all the information he possesses that concerns his offense or related offenses." *Adu*, 82 F.3d 119 at 124. The related offenses must be "part of the same course of conduct or of a common scheme or plan [as the convicted offense]." *Id.* (quoting § 5C1.2(5)). *See also United States v. Maduka*, 104 F.3d 891, 894 (6th Cir. 1997). If the ability of a defendant to commit a drug offense depends on the active participation of other people, information about such participation constitutes information about both "the offense of conviction" and "relevant conduct." *Id*. These requirements reflect the fact that the safety valve "was intended to benefit only those defendants who truly cooperate." *United States v. Odell*, 247 F.3d 655, 675 (6th Cir. 2001) (quoting *United State v. Marin*, 144 F.3d 1085, 1094 (7th Cir. 1998), *cert. denied*, 525 U.S. 916 (1998)).

As noted above, Urbina was interviewed by DEA Agent Michael Templeton as a result of his agreement to cooperate. Agent Templeton terminated the interview with Urbina after only about ten minutes because, according to Agent Templeton, Urbina was not being truthful. The information provided by Urbina conflicted with that given by Cervantes-Gomez and Barnett and his story that he was recruited by someone unknown to him except by the name of "Jose Chavo," that he did not

know that he had been hired to cultivate marijuana until he arrived at the marijuana patch, his testimony about how he got to the grow site, his conflicting statements about the amount of time he spent at the grow site, and his minimization of the role of Jesus Hureta in the offense all lack credibility. Furthermore, his testimony about the phone call he made to Hureta about the time agents stopped the van driven by Barnett is incredible as well. In short, it cannot be said that Urbina has "truly cooperated." And, in fact, it appears that he failed to cooperate at all. Under these circumstances, he cannot meet the fifth criterion for safety valve eligibility.

### Section 3B1.2/Minor Participant

Under USSG § 3B1.2, a defendant who was a minor participant in criminal activity is eligible for a two level decrease in his offense level. The adjustment is "for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant." USSG § 3B1.2, App. note 3(A). A "minor participant" is defined as one "who is less culpable than most other participants, but whose role could not be described as minimal." USSG § 3B1.2, App. note 5. The defendant argues that since he was only involved with the cultivation of 3,717 marijuana plants (371.7 kilograms of marijuana) out of a total of 13,132 kilograms involved in the totality of the conspiracy, and because he received no payment or wages for his work, he is entitled to the reduction.

As an initial matter, this guidelines objection is moot since the defendant has a 120 month restricted guideline range and faces a ten year mandatory minimum term of imprisonment. In other words, resolution of the objection would not effect defendant's guideline calculation. Beyond that, while defendant is less culpable than many of those involved in this conspiracy, he certainly is not the least culpable. Furthermore, he is being held accountable only for the quantity of marijuana in

11

which he was directly involved. He is not entitled to a minor participant role adjustment.

## Conclusion

In sum, the defendant's objections to the enhancement of USSG § 2D1.1(b)(1) and his objection related to his claim of eligibility for safety valve treatment are without merit and are **OVERRULED**. Likewise, the defendant's objection pursuant to USSG § 3B1.2 is **OVERRULED** and **DENIED AS MOOT**. The Court therefore adopts the calculation of the advisory guideline range contained in the PSR, i.e. a guideline range for imprisonment of 57 to 71 months; however, because the defendant faces a mandatory minimum term of imprisonment of ten years, his restricted guideline range for imprisonment is 120 months. He faces a maximum of life imprisonment by statute.

So ordered.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE
